# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED CENTRAL BANK**
    Plaintiff,

 v.                Case No. 10-CV-00464

**MAPLE COURT LLC, et al.,**
    Defendants.

## DECISION AND ORDER

In this diversity case, plaintiff United Central Bank ("UCB") sought to enforce a promissory note and foreclose on a mortgage on three apartment buildings. UCB named several defendants, but only three have actively defended this suit. They are Maple Court, LLC and 2905 Wisconsin, LLC ("the LLCs"), and James Crosbie, the sole member of the LLCs.[1] I granted UCB's motion for summary judgment and entered final judgment in this case on October 16, 2013. Defendants did not object to entry of final judgment or appeal. However, on April 7, 2014, they filed a motion to enforce a settlement agreement that they claim the parties entered into prior to the entry of final judgment. Around the same time, UCB filed a motion to correct two errors in the judgment. Both of these motions are before me now.

## I. BACKGROUND

On November 4, 2005, Mutual Bank in Harvey, Illinois made a loan to the LLCs. This loan was evidenced by a promissory note ("the Note") in the amount of $3,225,000.

---

[1] Unless otherwise indicated, when I refer to "defendants," I mean these three parties.

The Note was scheduled to mature on November 4, 2010. The LLCs own three apartment buildings in Milwaukee located respectively at 2625 and 2635 West Juneau Avenue and 2904 West Wisconsin Avenue. To secure the loan, they executed a Mortgage, Security Agreement and Fixture Filing ("the Mortgage") for these properties, an Assignment of Rents and Leases, and a Security Agreement for all goods acquired for use in connection with the properties. Crosbie and another defendant, Brendan Sullivan, also executed a Guaranty promising full and prompt payment of all indebtedness under the Note. In July 2009, regulators closed Mutual Bank, and the Federal Deposit Insurance Corporation ("FDIC"), as the receiver, sold the Note and related security agreements to UCB. At that point, the LLCs were behind on their payments, and they subsequently fell even further behind. As a result, in April 2010, UCB notified the LLCs that they were in default and commenced this action.

UCB sought to foreclose on the mortgage, collect damages from the LLCs for breach of the Note and collect damages from Crosbie and Sullivan for breach of the Guaranty. Defendants filed several counterclaims alleging that UCB had failed to perform its duties under the Note. After completion of discovery, UCB moved for entry of summary judgment on its claims and defendants' counterclaims. I granted its motion on August 27, 2013. I gave UCB 30 days to submit a proposed judgment and gave defendants 15 days to object to that judgment. UCB filed a proposed judgment and judgment of foreclosure on September 26, 2013. Defendants did not file any objections, so I entered the judgment. The judgment states that, as of September 30, 2013, defendants owed plaintiff $5,917,098.92, and it orders the United States Marshal to sell the apartment buildings at public auction after the conclusion of a six-month redemption period.

In March 2013, while UCB's motion for summary judgment was still pending, the parties discussed the possibility of a settlement based on a short sale of the apartment buildings. In a short sale, a borrower/property owner finds a third party to purchase property for less than the amount of the loan secured by the property. Generally, the borrower and the bank will also enter into an accompanying agreement under which the bank will forgive all or part of the loan in exchange for the sale proceeds. On March 21, defendants' counsel sent UCB a Letter of Intent signed by Michael Scully, a representative of third-party Mad River Holdings, Inc. ("MRHI"), offering to purchase the apartment buildings for $850,000 with a closing date no later than May 31, 2013. Defendants' counsel also provided UCB with financial documentation proving that MRHI had sufficient funds to purchase the properties at this price. On June 4, 2013, defendants' counsel asked UCB if it needed anything else to complete the settlement. UCB informed defendants that they would need to submit a written settlement agreement for approval by UCB's loan committee and board. UCB asked that the settlement "be structured as a short sale, with a full release of all claims in the litigation." (Mot. to Enforce Settlement Agreement, Ex. D, ECF No. 212-6.)

On June 6, 2013, defendants' counsel emailed UCB a draft settlement agreement.[2] In response, UCB notified them that there were several problems with the text of the proposed agreement and that defendants needed to attach a copy of the real estate

---

[2] Defendants claim UCB sent them a draft settlement agreement first, but they have not submitted a copy of this document to the court. All they submit is an email from UCB's counsel on June 4, 2013 stating, "Attached is the form settlement agreement that I usually use." (Mot. to Enforce, Ex. E, ECF No. 212-7.) From this email all I can conclude is that UCB sent defendants a form that they could use to create a draft agreement.

3

contract for the proposed short sale. UCB offered to help defendants out by revising the text of the agreement. It also notified defendants that Crosbie and Sullivan would need to sit for debtor's examinations if they wanted UCB to release them from their obligations under the Guaranty.

On June 17, 2013, defendants' counsel asked UCB to send him the real estate documents necessary to complete the short sale because defendants wanted to close the deal by June 28. UCB replied that it could not prepare the contract for the short sale because it did not represent either the seller (the LLCs) or the buyer (MRHI). It then described how the short sale would work and what UCB's role would be in it:

> "The settlement agreement will essentially stipulate that the bank (as first lien holder and mortgagee) will consent to the short sale of the property, provided that certain deal terms are met (namely, purchase price and 100% net proceeds being delivered to them). Other than that, the bank will monitor the transaction and agree to provide a release of its mortgage on the property upon receipt of 100% net sales proceeds. This is the structure of just about all short sales."

(Mot. to Enforce, Ex. H, ECF No. 212-10.) On June 20, 2013, UCB emailed defendants a draft settlement agreement and an arms length transaction affidavit for the LLCs and MRHI to sign. The draft settlement agreement stated that UCB would release its mortgage and dismiss its claims against the LLCs upon receipt of the proceeds from the short sale, but it did not release Crosbie and Sullivan from their obligations as guarantors of the Note. UCB did not sign the settlement agreement, and it asked how defendants were progressing with "a formal contract with respect to the sale of the property." (*Id.*)

Defendants' counsel, who also represents MRHI and Scully, responded the same day with a letter stating, "The offer to settle the action and purchase the property was premised on a close of no later than May 31. Please advise on the close date so we can

4

determine whether a settlement is still possible."[3] (UCB's Br. in Opp., Ex. 1, 2, ECF No. 218-1. 218-2.) The letter also included a list of repairs that defendants demanded UCB make to each property before closing. UCB stated that defendants were the only ones with the power to set a closing date, and it refused to pay for any repairs to the properties.

On July 2, 2013, defendants' counsel asked UCB if it would be willing to do a note sale instead of a short sale.[4] A note sale occurs when a third party purchases a loan package consisting of a promissory note and the accompanying security agreements. Defendants asked if UCB would sell the Note to another bank if MRHI could find someone willing to buy it. UCB said it was theoretically open to a note sale but that the FDIC would only approve such a sale if a bank paid 90% of the value of the note, which was unlikely. On August 7, 2013, defendants' counsel asked UCB to take care of all of the other liens on the properties, which added up to almost $80,000. UCB replied, "We did not represent or agree that the properties would be free and clear of all liens and judgments. . . . The bank is just releasing a note and mortgage in exchange for the payment of money." (Mot. to Enforce, Ex. L, ECF No. 212-14.)

On August 15, 2013, UCB sent defendants another draft settlement agreement. By this point, both Crosbie and Sullivan had sat for a debtor's examination, and the revised agreement released them from their obligations under the Guaranty. UCB left a blank for

---

[3] This letter is dated June 19, 2013, but it was not emailed to UCB's counsel until June 20.

[4] Defendants claim that most of the communications sent by their attorney to UCB after July 1 were not from them but instead were communications on behalf of MRHI. However, the emails do not say who defendants' attorney was representing during each communication. Therefore, I assume (as UCB must have) that he was speaking on behalf of both defendants and MRHI in all of his communications.

5

defendants to write in their proposed closing date.[5] To move forward, UCB said it would also need an updated proof of funds letter from MRHI/Scully, defendants' signatures on the revised settlement agreement, an executed copy of the arms length transaction affidavit, and a signed real estate contract. In response, defendants' counsel stated that the liens on the property were a significant problem and that Scully wanted to pursue a stipulated foreclosure in order to extinguish the liens held by defendants who had defaulted in this case. A few days later, defendants' counsel stated that Scully was willing to buy the Note from the bank himself for $850,000 so he could foreclose on it. UCB said it was willing to consider either a stipulated foreclosure or a note sale but reiterated that the FDIC would need to approve a note sale.

On August 30, 2013, after I granted UCB's motion for summary judgment, UCB informed defendants that it was still interested in pursuing the short sale. It again asked defendants to provide it with a signed settlement agreement, arms length affidavit and real estate contract. It stated: "Once the bank has the above documents, they will be reviewed in mid-September, and assuming final approval occurs, your clients should be able to close before the end of September." (Mot. to Enforce, Ex. M, ECF No. 212-15.)

Defendants did not execute the required documents. Instead, their attorney suggested another alternative transaction. He suggested that UCB go ahead with the foreclosure and purchase the properties at the foreclosure sale itself by making a credit

---

[5] The draft agreement states: "In consideration of the Parties' execution of this Agreement, Lender agrees to allow Borrowers to attempt to sell the property to a bona fide third party purchaser, provided that . . . any sale and purchase contract contemplating the same incorporates . . . a closing date to be on or before _____, 2013." (Mot. to Enforce, Ex. L at 6.)

bid. This would extinguish most of the liens on the properties, and UCB could then sell the properties to MRHI for $850,000. UCB rejected this offer. It said it was fine with proceeding with the foreclosure, but it could not disclose the bid it would make at the auction or guarantee that it would not be outbid by someone else. It informed defendants that, if they had any other offers that they would like UCB to consider, they should reduce them to final written form and submit them to UCB for review. Until that time, UCB stated that it was "proceeding with the foreclosure." (UCB's Br. in Opp., Ex. 8, ECF No. 218-8.) On September 17, 2013, defendants replied that they were again exploring the possibility of a short sale.

On October 16, 2013, I entered final judgment. Shortly thereafter, defendants' counsel sent UCB an email stating that a bank representative had told him the short-sale deal was off. He told UCB: "I understand you are moving forward with the foreclosure to appease the FDIC, but we still have our deal and these final details. . . . Do you want us to file a notice of appeal to keep our rights in place also? I need written confirmation from you that we have our deal at $850,000." (UCB's Br. in Opp., Ex. 9, ECF No. 218-9.) UCB's counsel replied:

> "'We' meaning UCB and the borrowers/guarantors do not have a 'deal'. We gave you a list of signed items the bank would need if borrowers/guarantors want to proceed on a short sale. To date, we haven't received anything from your office to move a short sale to completion . . . . Whether you file a notice of appeal is not up to me, but if the borrowers/guarantor[s] do, we will file a cross-appeal on the motion for sanctions."

(*Id.*) On December 18, 2013, defendants submitted to UCB a signed settlement agreement, arms length affidavit and a contract for the sale of the properties to MRHI for $850,000. After some additional negotiations, UCB declined to sign the settlement

7

agreement, and, on March 24, 2014, terminated all settlement discussions. All of these facts are undisputed.

## II. DISCUSSION

Defendants claim the correspondence between the parties' attorneys was sufficient to create a binding settlement agreement that requires UCB to consent to a short sale of the apartment buildings to MRHI for $850,000 and to release its mortgage and all of its claims against defendants in exchange for the proceeds from the sale. UCB denies entering into an enforceable settlement agreement. A request that a court enforce a settlement agreement after the entry of final judgment, whether through an award of damages or decree of specific performance, is more than just a continuation of the lawsuit. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 378 (1994). It is a separate claim for breach of contract. *Id.* Therefore, it requires its own basis for jurisdiction. *Id.* Defendants' breach of contract claim is governed by state law, but I have jurisdiction over it because this is a diversity case and the amount in controversy under the alleged settlement agreement exceeds $75,000. *See* 28 U.S.C. § 1332; *see also Blue Cross and Blue Shield Assoc. v. American Express Co.*, 467 F.3d 634, 638 (7th Cir. 2006) (noting that *Kokkonen* deals with a court's "adjudicatory competence" and that, "[a]s long as § 1332 supplies authority to decide, the court may act without a fresh complaint").[6]

---

[6] In their reply brief in support of the motion to enforce the settlement agreement, defendants suggest that the judgment should be set aside under Fed. R. Civ. P. 60(b)(3) because UCB has engaged in fraud, misrepresentation and misconduct. They did not, however, ask for such relief in their motion or opening brief and do not develop this argument in their reply brief. Therefore, I disregard it.

The next question is whether the parties entered into an enforceable settlement agreement, and, if they did, what action the agreement requires UCB to take in connection with this lawsuit. The parties disagree about what state's law governs the alleged settlement agreement. Defendants argue that Wisconsin law governs while UCB argues that Illinois law governs. I do not need to resolve this dispute because I conclude that the settlement agreement is unenforceable under either state's law because a contract was never formed.

The basic principles of contract formation are similar in Wisconsin and Illinois. Where the material facts are undisputed, the existence of a valid, enforceable contract presents a question of law which can be resolved on summary judgment. *In re F.T.R.*, 349 Wis. 2d 84, 101 (2013); *Reese v. Forsythe Mergers Group, Inc.*, 682 N.E.2d 208, 979 (Ill. App. Ct. 1997). For a contract to be valid, there must be an offer, an acceptance and consideration. *F.T.R.*, 349 Wis. 2d at 115; *Van der Molen v. Wash. Mut. Finance, Inc.*, 835 N.E.2d 61, 69 (Ill. Ct. App. 2005). "An offer and acceptance exists when mutual expressions of assent are present." *Gustafson v. Physicians Ins. Co. of Wisconsin, Inc.*, 223 Wis. 2d 164, 173 (Ct. App. 1998); *see also Reese*, 682 N.E.2d at 979 ("[T]here must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting."). And a court determines the parties' intent by considering their words, written and oral, and their actions. *American Nat'l Property and Cas. Co. v. Nersesian*, 277 Wis. 2d 430, 442 (Ct. App. 2004); *Vill. of South Elgin v. Waste Mgmt. of Ill.*, 810 N.E.2d 658, 672 (Ill. Ct. App. 2004) ("'Intent' refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does

not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware.").

Here, the facts are undisputed and I have copies of all of the relevant correspondence between the parties. Therefore, I can decide as a matter of law whether a contract was formed. I conclude that a contract was never formed because neither party made an offer that the other accepted. "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981).

Defendants claim they made an offer when their counsel emailed UCB a copy of MRHI's Letter of Intent stating that it was willing to purchase the properties for $850,000. But this letter was not an offer to settle this case. In fact, it made no reference to this case. It stated only that MRHI was willing to purchase the properties, and it was signed only by MRHI and not by any of the defendants. Furthermore, the letter expressly stated that it was a "non-binding Letter of Intent," which shows that it was not an offer to enter into a binding contract. (Mot. to Enforce, Ex. B, ECF No. 212-4.) Defendants do not point to any other document that they claim constitutes an offer by them to settle this lawsuit, and the only offer I could identify by them was the signed settlement agreement that they submitted to UCB on December 18, 2013. UCB clearly rejected this offer by refusing to sign the agreement and terminating settlement negotiations.

UCB did not make an offer either. It informed defendants at the outset of the parties' negotiations that it could not enter into a binding settlement agreement unless the agreement was approved by its board. Although defendants now try to minimize this requirement by describing board approval as a mere "rubber stamp," they admit that they

were aware that this was a requirement. (Defs.' Reply Br. at 8, ECF No. 219.) And the emails between the parties confirm this awareness. In its August 30, 2013 email, UCB reminded defendants that the settlement agreement would need to be submitted for internal review, and defendants acknowledged that review by the board was necessary in their email to UCB on October 14, 2013. (*See* Mot. to Enforce, Ex. N ("Assuming we are able to get all of the documents signed this month, I believe it may take a few weeks for the next presentation to the board, right?").)

Since UCB conditioned its assent to the terms of the settlement agreement on approval by the board, none of its correspondence with defendants can be construed as a binding offer. "'A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.'" *Vill. of South Elgin v. Waste Mgmt. of Ill.*, 810 N.E.2d 658, 672 (Ill. Ct. App. 2007) (*quoting* Restatement (Second) of Contracts § 26 (1981) ("Preliminary Negotiations")). Additionally, where it is part of the understanding between the parties that the contract will not be binding until they sign a formal, written contract, there is no binding contract unless the written agreement was actually prepared and signed by both parties. *See American Nat'l Property*, 277 Wis. 2d at 443; *Johann v. Milwaukee Elec. Tool Corp.*, 270 Wis. 573, 589 (1955); *Quake Const., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990). This is true even if all the terms of the contract have been agreed upon. *Quake Const.*, 565 N.E.2d at 994; *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–17 (7th Cir. 1987) (applying Wisconsin law).

Because there was neither a valid offer nor a valid acceptance, there is no binding contract between the parties. Thus, there is no settlement agreement for me to enforce. Since the parties never formed a contract, there is no need for me to consider UCB's alternative argument that the writings exchanged between the parties were insufficient to meet the heightened requirements set out in the Illinois Credit Agreements Act, 815 ILCS 160/1, for the modification of a credit agreement or in Wis. Stat. § 807.05 for settlement agreements.

Alternatively, defendants argue that this court has the authority to enforce the terms of the settlement agreement under a theory of equitable estoppel. However, they do not adequately develop this argument in their brief. They only discuss equitable estoppel in two short paragraphs at the end of their opening brief and do not discuss it at all in their reply brief. Therefore, I find that they have waived it. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (even arguments that are raised are waived "if they are underdeveloped, conclusory or unsupported by law").

Even if it were not waived, I would reject this argument on the merits. Defendants present this argument as a defense to invalidation of the parties' contract under Wis. Stat. § 807.05. They argue that there is a valid contract and that it should be enforced even if it does not meet the heightened requirements of this statute.[7] However, such a defense cannot help defendants because they have not proven that there was a valid contract even if I ignore Wis. Stat. § 807.05. The case defendants cite in their brief suggests that a party

---

[7] Wis. Stat. § 807.05 states: "No agreement, stipulation, or consent between the parties or their attorneys, in respect to the proceedings in an action or special proceeding shall be binding unless . . . made in writing and subscribed by the party to be bound thereby or the party's attorney."

may be entitled to relief under a theory of equitable estoppel even if there is not a valid contract, *see Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 291 Wis. 2d 259, 274 n.8, 275–76 (2006), but defendants do not make this argument. Even if they did, I would reject it.

The only case defendants cite in support of their equitable estoppel claim is *Affordable Errecting*, which is a Wisconsin case. Under Wisconsin law, a party has a claim for equitable estoppel when it "demonstrates that it was induced by some action or inaction of another party, and reasonably relied to its detriment." *Hocking v. City of Dodgeville*, 326 Wis. 2d 155, 174–75 (2010). The elements of equitable estoppel are: "(1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; (4) which is to the relying party's detriment." *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 291 Wis. 2d 259, 275 (2006). Each of these elements must be proven by "clear, satisfactory, and convincing" evidence. *Nugent v. Slaght*, 249 Wis. 2d 220, 237 (Ct. App. 2001). "When the facts and reasonable inferences therefrom are not disputed, it is a question of law whether equitable estoppel has been established." *Milas v. Labor Assoc. of Wis., Inc.*, 214 Wis. 2d 1, 8 (1997).

Defendants suggest that I enforce the settlement agreement because they detrimentally relied on UCB's representations that it would consent to the short sale and settle the case. Defendants claim they took the following actions in reliance on UCB's promise to execute the settlement agreement: 1) defendants located a purchaser willing to pay $850,000 for the apartment buildings as part of a short sale, 2) Crosbie sat for his

debtor's examination, 3) defendants paid for the transcript of Crosbie's debtor's examination, 4) defendants engaged the services of an escrow company to draft purchase documents, conduct a title search, procure title insurance and prepare closing documents, 5) defendants negotiated nearly $80,000 of additional liens on the properties, and 6) defendants did not enforce their right to appeal the judgment and judgment of foreclosure.

This claim fails for reasons similar to those discussed in connection with the breach of contract claim. Defendants cannot prove that they reasonably relied on UCB's representation that it would consent to the settlement because the undisputed facts show that UCB never made such a representation. It informed defendants at the outset of the parties' negotiations that any settlement agreement would need to be approved by UCB's board and that approval was not guaranteed. (*See* Mot. to Enforce, Ex. M (UCB's August 30, 2013 email, stating that "*assuming final review occurs*, your clients should be able to close before the end of September" (emphasis added))). Defendants may have assumed that approval was guaranteed, but there is no evidence that shows UCB actually made such a representation. *Cf. Affordable Errecting*, 291 Wis. 2d at 276–77 (finding reasonable reliance where plaintiff's attorney assured defendant that plaintiff would approve the settlement and later told its own insurer that it had approved the settlement).

Defendants also fail to establish detrimental reliance. To prove detriment, defendants must show that they suffered more than a minor inconvenience. "'Detriment' in this context is equated with 'prejudice' and means 'injury or damage.' The injury or damage must be 'actual and material or substantial, and not merely technical or formal.'" *Nugent*, 249 Wis. 2d at 239 (citations omitted). First, defendants did not have to go to any

14

great effort to find a purchaser willing to buy the apartment buildings in a short sale. Scully and MRHI have been involved in the settlement discussions since at least 2012 and have offered to purchase the properties on multiple occasions. Second, that Crosbie attended a debtor's examination, paid the transcript fee and hired someone to draft the real estate documents for the short sale does not establish detrimental reliance. These tasks involved only slight burdens that did not substantially impact defendants. UCB also had to hire and pay attorneys to draft documents. This is a normal part of negotiating a contract. Defendants also claim they "negotiated nearly [$80,000][8] of additional liens" on the properties, but they do not explain how this injured them. (Defs.' Br. in Support at 10, ECF No. 212-1.)

Defendants also state that they gave up their right to appeal based on the supposed settlement. But if they did, the decision was clearly unreasonable. On September 16, 2013, UCB informed defendants that they were free to make additional offers of settlement, but until the parties entered into an agreement UCB was proceeding with the foreclosure. And it made its intentions clear when it filed its proposed judgment and judgment of foreclosure on September 26, 2013. At that point, defendants could have objected to entry of the judgment or asked me to stay the case while the parties completed their settlement negotiations, but they did nothing. Instead, they waited until I entered final judgment and then asked UCB if they needed to preserve their rights by filing a notice of appeal. On October 23, 2013, before the time for appeal expired, UCB told them in no uncertain terms

---

[8] Defendants' brief says they negotiated nearly $800,000 of additional liens but the other documents indicate that the liens added up to only $80,000. So I assume this was a typo.

that, "'We' meaning UCB and the borrowers/guarantors do not have a 'deal',"  and it invited defendants to file a notice of appeal. After receiving this email, it should have been obvious to defendants that they needed to file a notice of appeal if they wished to preserve their rights.

For all of these reasons, I will deny defendants' motion to enforce the settlement agreement and order conclusion of a short sale.

UCB moves to amend/correct the judgment and judgment of foreclosure in two ways. First, it seeks to add the names of defendants Appliance World, Inc. and Crosbie Family Limited Partnership to Paragraph 10 of the judgment, which declares that defendants' interest in the mortgaged premises are inferior to UCB's interest. I issued orders granting judgment against both of these defendants, but inadvertently omitted them from this paragraph of the final judgment. UCB seeks to correct this clerical error under Fed. R. Civ. P. 60(a). Second, UCB seeks to replace the U.S. Marshal with the Milwaukee County Sheriff as the agent for sale of the mortgaged premises. Defendants do not oppose either of these requests. Therefore, I will grant the motion to amend/correct the judgment and issue an amended judgment and judgment of foreclosure that reflects these changes.

### III. CONCLUSION

**IT IS ORDERED** that defendants' motion to enforce the settlement agreement and order conclusion of a short sale (Docket #212) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to amend/correct the order for judgment and judgment of foreclosure (Docket #211) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 30th day of May, 2014.

        s/ Lynn Adelman
        _____
        LYNN ADELMAN
        District Judge